Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 2249 | **DATE** | 9/30/2004 |
| **CASE TITLE** | David D. Tibbetts vs. RadioShack Corp. | | |

**MOTION:**   [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. RadioShack's motion for summary judgment (Doc. No. 30-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **3** | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | SEP 30 2004 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | docketing deputy initials | **62** |
| ✓ | Mail AO 450 form. | | | 9/28/2004 | |
| | Copy to judge/magistrate judge. | | | date mailed notice | |
| | ETV | courtroom deputy's initials | U.S. DISTRICT COURT 2004 SEP 30 AM 10: 23 Date/time received in central Clerk's Office | ETV mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
SEP 30 2004

DAVID D. TIBBETTS,                    )
                                      )
            Plaintiff,                )
                                      )
      v.                              )     No. 03 C 2249
                                      )
RADIOSHACK CORPORATION,               )     Judge Rebecca R. Pallmeyer
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER

Until 2002, Plaintiff David Tibbetts worked for RadioShack Corporation as a Senior Store Manager in Evanston, Illinois. Tibbetts had a poor performance record in that job, and in July 2002, he was demoted to the title of store manager. Later that year, RadioShack determined to move the store to a new location in Evanston, and Tibbetts's supervisor decided to replace him as manager. Tibbetts lost his job in November 2002.

In this lawsuit, Tibbetts claims the real reason for his discharge was his participation in a nationwide class action, filed just two weeks earlier, challenging RadioShack's pay practices under the Fair Labor Standards Act ("FLSA"). *See Perez v. RadioShack Corp.,* No. 02 C 7884, 2003 WL 21372467 (N.D. Ill. June 13, 2003). He also argues that his employment relationship with RadioShack was contractual, and that his November 2002 termination constituted a contract breach. RadioShack has moved for summary judgment, arguing there are no disputes of fact concerning his performance, that Tibbetts's role in the *Perez* case had nothing to do with his discharge, and that Tibbetts was an "at will" employee of the company, with no contractual protections. For the reasons explained here, RadioShack's motion for summary judgment is granted.

6 2

## FACTS[1]

### The Parties

Defendant RadioShack is a Delaware corporation with its headquarters in Fort Worth, Texas which employs more than 30,000 persons and does business in thousands of retail stores throughout the country.  (Def.'s 56.1 ¶ 2; Pl.'s 56.1 ¶ 3.)  From 1989 until 2002, Plaintiff David D. Tibbetts was employed by RadioShack as a store manager.  (Def.'s 56.1 ¶ 1.)  In 1997, Tibbetts was assigned to store number 016498 in Evanston, Illinois, as senior store manager.  (Id.)  In early 2002, RadioShack initiated the process of moving store 016498 to a new location in Evanston.  (Id. ¶ 7.)[2]  On November 14, 2002, Tibbetts was terminated effective the following day.  (Id. ¶ 8.)

### Tibbetts's Performance History

David Tibbetts received numerous performance awards and accomplishments during his 13-year tenure, including five "Manager of the Month" awards; 10 "Manager Personal Sales Dominator" awards, and several other awards for his personal sales performance.  (Pl.'s 56.1 ¶ 63; Def.'s Response ¶ 63.)  On January 12, 2002, Tibbetts's then-District Sales Manager sent Tibbetts a thank-you e-mail congratulating him on his personal sales performance.  (Pl.'s 56.1 ¶ 64.)  As of August of that year, Tibbetts was ranked 2 out of 224 sales managers in the Chicago Region

---

[1]  The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1.  RadioShack's Local Rule 56.1 Statement of Material Facts is cited here as "Def.'s 56.1 ¶ ___."  Plaintiff's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Response ¶ ___."  Plaintiff has also submitted an Additional Statement of Facts, cited here as "Pl.'s 56.1 ¶ ___."  Defendant's Response to Plaintiff's Additional Statement of Facts is cited here as "Def.'s Response ¶ ___."

In addition to his Local Rule 56.1 submissions, Plaintiff has filed a motion to strike large portions of Defendant's Local Rule 56.1 Statement.  That motion is granted in part and denied in part in a separate order.

Finally, the court notes that several of the statements in Plaintiff's submissions relate to Tibbetts's (and his fellow managers') claim for overtime compensation.  That substantive claim is not relevant to this case, however, and the court therefore makes no reference to those facts.

[2]  Plaintiff objects to this assertion as "vague," but does not deny it. (Pl.'s Response and Motion to Strike, ¶ 51.)

for his personal sales. (*Id.* ¶ 68.) Tibbetts's personal sales total for the year prior to October 30, 2002 was the highest of all 27 store managers in his district. (*Id.* ¶ 70.)

Also throughout his career with RadioShack, however, Tibbetts had recurring problems with store appearance and with employee retention and development. (*Id.* ¶ 73.) Tibbetts was warned repeatedly that he "would be disciplined for a variety of things including poor store appearance and/or poor people readiness." (Def.'s 56.1 ¶ 9.)[3] In the two years before his termination, Plaintiff was supervised by one Regional Sales Manager (James Bradley) and three Divisional Vice Presidents (Michael Crist, Charles Morrow, and Michael Lohse). (Pl.'s 56.1 ¶ 54.) Prior to Mr. Lohse's assuming the position of District Manager for District 0568, other managers and loss prevention specialists had prepared reports documenting their review of Tibbetts's performance as manager. (Def.'s 56.1 ¶ 11.) For example, on February 8, 2001, Loss Prevention Specialist Keith Abraham visited the store Tibbetts managed and prepared a report in which he noted, "STORE APPEARANCE DISASTER," and provided direction on matters that Tibbetts was expected to correct. (*Id.* ¶ 12.)

RadioShack District Sales Managers were expected to conduct store visits and to assess the store manager's performance with respect to "people readiness" and "store readiness." (Pl.'s 56.1 ¶ 79.) In a store visit report for a September 8, 2001 visit, District Manager Charles Morrow noted that since he (Morrow) had arrived in the district, Tibbetts's store "has always been a disaster area with little improvement after several visits from [Morrow] and [Regional Manager] Mr. Bradley." (9/08/01 Store Visit Report, Ex. 9 to Tibbetts's Dep. [Ex. 38 to Def.'s 56.1].) The report called the store's backroom the "worst [Morrow] has ever seen," and noted that employees hired by Morrow

---

[3]     Plaintiff objects to this assertion as vague, as well, but as the statement is a direct quote from Plaintiff's own answers to interrogatories, this objection is overruled.

to work for Tibbetts had all quit. (Id.)[4]   On a scale of 1-5, with 5 being the best, Morrow gave

Tibbetts's store a grade of 0 on sales readiness.  On people readiness, Morrow graded the store

a D on a standard A through F grading scale.  (Def.'s 56.1 ¶ 14.)  In a March 29 e-mail message

reviewing the March 14, 2002 store visits, James Bradley detailed numerous problems:

> Dave [Tibbetts] continues to run off associates and for 2 years has had staffing
> problems.  He is waiting for the store to relo[cate] hoping it will solve his problems
> and has given up on this store.  The office management is horrible.  We [Bradley
> and Morrow] have discussed what you [Morrow] need to do here but you are not
> going to be able to unless your bullpen is stronger.

(3/29/02 E-mail from Bradley to Morrow concerning store visits, Ex. 20 to Def.'s 56.1.)   Plaintiff

admits that in his March 14, 2002 report, Morrow noted that he warned Tibbetts to "fix the problem

or be replaced."  (Def.'s 56.1 ¶ 16.)

After a June 27, 2002 follow-up store visit, Morrow prepared a report again noting Tibbetts's

performance deficiencies, including Tibbetts's failure to train a sales associate hired six months

earlier, customer complaints, and Tibbetts's attitude toward customers.  Morrow's report, which

Tibbetts signed, warned that if the store were not "sales ready" and his staff not trained, Tibbetts

"will no longer be a manager for RadioShack."  The report noted that Tibbetts had been given one

and a half years to address these issues, concluded, "You are NOT doing job," and announced,

"Dave, this is your last warning! I expect compliance immediately with your job requirements."  (Id.

¶ 17.)  In this report, Morrow gave Tibbetts's store a grade of 1 for sales readiness and a grade

---

[4]       Plaintiff asserts that Morrow had no power to terminate store managers, never
himself recommended a store manager for termination based upon store appearance or people
readiness, and was not aware of any store manager having been terminated for these reasons.
In support, he cites several paragraphs of an affidavit from Mr. Morrow.   Morrow's affidavit
confirms the parties' agreement that a RadioShack District Sales Manager did not have authority,
on his own, to terminate a store manager without approval of the Regional Sales Manager, but says
nothing about termination of a store manager for store appearance or people readiness. Morrow's
affidavit also states that RadioShack procedure called for District Sales Managers to "find faults"
and to "threaten discipline."  (Morrow Aff., Ex. 2 to Pl.'s 56.1, ¶ 7.)  Plaintiff also cites an undated
document that appears to counsel a District Sales Manager conducting a store visit to "look for
what's wrong, not for what's right."  ("Effective Store Visits," Ex. 58 to Pl.'s 56.1.)

of D for people readiness. (*Id.* ¶ 18.) Plaintiff admits receiving this report, though he notes that Morrow never did terminate him. (Pl.'s Response ¶ 60.) He also acknowledges that the average scores for stores in his district in the twelve months prior to September 2002 was 2.4 for sales readiness and C for people readiness, compared with his own average scores of 1.8 and D+. (Pl.'s 56.1 ¶¶ 81, 82.) Plaintiff contends that five of the other 19 sales managers in his district received similarly low scores, but Defendant notes that three of those managers had been in their stores for less than 12 months at the time of the report at issue. (Pl.'s 56.1 ¶¶ 83-85; Def.'s Response ¶¶ 83-85.)

On July 9, 2002, Tibbetts was demoted from Senior Manager to regular store manager status. (Def.'s 56.1 ¶ 19.) Such a demotion decision required approval of RadioShack's Divisional Vice President. (Pl.'s 56.1 ¶¶ 43, 55.) Citing only his own affidavit, Plaintiff asserts that this happened "only because of decreased store sales resulting from reduced traffic flow in the strip mall," including the loss of such stores as Builder's Square and Trak Auto. (Pl.'s Response ¶ 63; Pl.'s 56.1 ¶ 32.) He notes, further, that 14 of the 26 stores in his district suffered losses as of September 30, 2002. (Pl.'s 56.1 ¶ 123.)

### Michael Lohse's Supervision of Tibbetts

On July 13, 2002, Michael Lohse was promoted to district manager for District 0568. (Def.'s 56.1. ¶ 21.) He visited Tibbetts's store on July 31, 2002, and prepared a report of that visit, signed by Tibbetts, in which he noted that the store "does not look sales ready," and that he (Lohse) would assist Tibbetts with recruiting. (*Id.* ¶¶ 22-23.) Plaintiff notes that recruiting was Lohse's own responsibility, not Tibbetts's, and that as of July 31, 2002, there were two full-time sales associates working in the store, the number that had been allocated by Charles Morrow. (Pl.'s Response ¶ 67.) Lohse gave Tibbetts's store a sales readiness grade of 2 and a people readiness grade of C. (Def.'s 56.1 ¶ 24.)

5

Lohse visited the store again on August 10, 2002. In the report he prepared, which Tibbetts signed, Lohse detailed deficiencies in recruiting, in sales readiness, and in Tibbetts's negative attitude. He warned:

> I will review this report on my next visit on 08/20. This all needs to be complete 100% for me to consider you running the NEW store. Running the new store is no guarantee for you to run it. It takes a manager that has a perfect looking store, NO negativity, teaches, coaches, and train their employees to open and run a NEW store. Completion of these tasks again will be used to consider WHO runs the Evanston Store.

(*Id.* ¶ 25.) Tibbetts admits the report includes these criticisms, explaining simply that his negative attitude was a function of Tibbetts's mother's declining health. (Pl.'s Response ¶ 69.) A "secret shopper" who visited Tibbetts's store on August 23, 2002, rated the store at 5 out of a possible 10. (Def.'s 56.1 ¶ 26.) On August 30, 2002, Tibbetts failed to attend a "Rewards Day Conference Call," resulting in Lohse's issuing a disciplinary report. (*Id.* ¶ 27.)

Lohse visited Tibbetts's store again on October 1, 2002. A report of that date identifies staffing issues and other deficiencies, including items that had been identified on August 10 but were not yet accomplished. The report referred specifically to a customer complaint received the day Tibbetts returned from vacation and warned that further complaints concerning indifference or poor attitude would result in discipline, possibly including termination. (*Id.* ¶ 28.) Though he testified that the report "looks vaguely familiar" and that he did "remember some of the text of this," (Tibbetts Dep., Ex. 38 to Def.'s 56.1, at 138), Tibbetts now denies receiving this report and notes that it lacks notations that ordinarily appear at the bottom of a RadioShack store visit report. (Pl.'s Response ¶ 72.) He notes, further, that it lacks his signature, though Lohse testified that Tibbetts did sign every store visit report that was given to him. (Pl.'s 56.1 ¶ 96.)

Also on October 1, 2002, Michael Lohse issued a disciplinary report to Tibbetts which he characterized as "a written counseling for failure to achieve the minimum [sales] expectations." The report characterized Tibbetts's performance as reflecting a "lack of attention," as a "very

6

serious issue" and as "not acceptable." Lohse's report concluded, "Failure on your part to follow these expectations will cause me to have a much deeper conversation, and it may include further disciplinary action . . . ." (Pl.'s 56.1 ¶ 106.) In fact, before the end of October 2002, Lohse had determined, together with Regional Manager James Bradley, that Tibbetts would not be the manager at the new Evanston location. (Def.'s 56.1 ¶ 29, citing Lohse Dep., Ex. 10 to Def.'s 56.1, at 141; Bradley Dep., Ex. 9 to Def.'s 56.1, at 83.)

Plaintiff denies that Lohse could make such a decision under RadioShack's "two-up" policy, but the court notes that Defendant claims Lohse did this with James Bradley's concurrence, not on his own. Indeed, the material Plaintiff himself cites, the testimony of RadioShack Vice President Robert Martinjak, confirms that the decision was made by Lohse and Bradley. (Martinjak Dep., Ex. 11 to Pl.'s Response, at 67.) Plaintiff asserts that Bradley never authorized Lohse to terminate Tibbetts, but the evidence is to the contrary. Asked at his deposition, "did you leave that decision [to discharge Tibbetts] to Lohse?" Bradley answered, "Yeah." Asked, "to the extent that he was terminated, that was something that you allowed Lohse to do?" Bradley responded, "Yes." (Bradley Dep., Ex. 9 to Def.'s 56.1, at 159.)

### Move to Evanston/Tibbetts's Termination

In October 2002, Lohse assigned Otoniel Ortiz to the new Evanston store location to prepare for the move of store 016498. (Def.'s 56.1 ¶ 30.)[5] Ortiz had completed RadioShack's manager-in-training program before November 15, 2002. (*Id.* ¶ 31.)[6] Ortiz completed "New

---

[5]    Plaintiff denies this; he notes that Ortiz was an assistant manager in training as of October 2002 and was not promoted to manager until November 15, 2002 (Pl.'s Response ¶ 74); neither of these facts is inconsistent with the statement in Def.'s 56.1 ¶ 30, however, and that statement is therefore deemed admitted.

[6]    Ortiz himself, and Regional Manager James Bradley, so testified; Plaintiff denies that Ortiz had completed the program, citing the declaration of District Manager James Morrow that the training record Defendant cites "relates to certification on RadioShack sales programs, not manager in training programs," and that the record was "the type used by RadioShack in the ordinary course of business." Plaintiff does not explain how those facts are inconsistent with

Manager Indoctrination" on November 19, 2002. (Pl.'s 56.1 ¶ 28.) In early November, prior to

Tibbetts's termination, Lohse told Ortiz that Ortiz was Lohse's candidate to manage store 016498

after the store move. (Def.'s 56.1 ¶ 32.)[7] In a December 2002 e-mail message, James Bradley

set out a "recap" of his November 7, 2002 visits with Mike Lohse to RadioShack stores in the

Chicago District. With respect to the Evanston store managed by Tibbetts, Bradley wrote:

> 6498, old location. What a mess. Make sure you have covered all your bases with
> Dave Tibbetts. I know you have store visits. Leave him with his pride. He does not
> have the skills to manager a store and his attitude is poor. I think it's best for him
> to find a different job.

(December 7, 2002 E-mail message, Ex. 39 to Pl.'s 56.1.)

RadioShack is organized into four geographic divisions, each headed by a Divisional Vice

President. (Pl.'s 56.1 ¶ 9.) On November 12 and 13, 2002, Robert Martinjak, Vice President for

RadioShack's Midwest division, visited Lohse to conduct RadioShack training under the "B.E.S.T."

program (the court is uncertain of the origin of this acronym) at several stores in Lohse's district,

not including store 016498. (Def.'s 56.1 ¶ 33.)[8] Under RadioShack policy, this training is to occur

within six months of the appointment of a new District Sales Manager; for Lohse, who became

---

Defendant's assertion concerning Ortiz's training status, however. Indeed, exhibits submitted by
Plaintiff assign a code of "N1" (for "Asst MIT-grad") to Ortiz as of November 8, 2002. (Productivity
Report, Ex. 36 to Pl.'s 56.1; Master Employee List, Ex. 37 to Pl.'s 56.1; Peoplesoft job code list, Ex.
38 to Pl.'s 56.1.)

[7]      Plaintiff denies this assertion, noting that Ortiz was not in fact promoted until
November 15, 2002; because that fact is not inconsistent with Def.'s 56.1 ¶ 32, that statement is
deemed admitted.

[8]      Plaintiff denies this assertion as well, noting (a) that Mr. Martinjak made his Chicago
flight reservations and hotel reservations on November 4, 2002; (b) that B.E.S.T. training is not
mentioned in Mr. Martinjak's or Mr. Lohse's calendar; and (c) that RadioShack calendars (at some
unidentified point) reflected other plans for Mr. Martinjak and Mr. Lohse on November 11. (Pl.'s
Response ¶ 77; Pl.'s 56.1 ¶ 10.) As none of this is inconsistent with Def.'s 56.1 ¶ 33, that
statement is deemed admitted. Defendant notes that Mr. Martinjak made other scheduled trips
without including all of the flight information on his calendar, including one trip in June 2002 and
two other trips in October 2002. (Def.'s Response ¶ 19.) Defendant notes, further, that Mr.
Martinjak's calendar did show the number "568," a reference to the Chicago district, on the pages
for November 12 and 13. (*Id.* ¶ 20.)

District Sales Manger in July 2002, such training was presumably required by February 2003. (*Cf.* Def.'s Response ¶ 126.) It is undisputed that during this November 2002 trip, Martinjak did not meet with any other District Sales Managers, nor did he meet with Regional Manager James Bradley. (Pl.'s 56.1 ¶ 16.) Mr. Martinjak does not recall any discussions with Bradley concerning Mr. Tibbetts in the previous year, but the parties agree that during the November 2002 training session with Lohse, he and Martinjak discussed Lohse's belief that Tibbetts should be removed as store manager after the store's move to a new location. (Def.'s 56.1 ¶ 34; Pl.'s 56.1 ¶¶ 17, 18.)[9] Plaintiff emphasizes the fact that Mr. Martinjak discussed Mr. Tibbetts's performance with Mr. Lohse, (Pl.'s Response ¶ 79), but does not rebut Defendant's assertion that Mr. Martinjak did not instruct Lohse or Bradley regarding what action should be taken concerning Tibbetts's employment. (Def.'s 56.1 ¶ 35.)[10]

Store 016498 moved to a new location in Evanston, Illinois on November 14, 2002. (*Id.* ¶ 36.) On November 14, 2002, Lohse met with Tibbetts, and, as Tibbetts himself recalls, "he [Lohse] said, well, your performance hasn't been up – to the effect that your performance hasn't been up to par. And I [Tibbetts] agreed." (*Id.* ¶ 37, citing Tibbetts Dep., Ex. 38 to Def.'s 56.1, at 47.) Tibbetts recalls, further, that Lohse said something about Tibbetts's performance in cell phone

---

[9]     The fact that RadioShack's policy did not permit Lohse to make this decision on his own (Pl.'s Response ¶ 78) is not inconsistent with this assertion.

[10]     Plaintiff asserts that Mr. Martinjak's approval was required before Mr. Tibbetts could be terminated, but none of the materials he cites supports that assertion. For example, Plaintiff cites the following testimony from Mr. Martinjak's deposition:

Q.     [D]o you know whose decision it was that he [Tibbetts] would not be the manager of the new location?
A.     That would have been the decision of Mike Lohse and Jim Bradley.
Q.     Did you in any way participate in making that decision?
A.     No.
Q.     Did you approve that decision?
A.     It's – it's not a – it's not a change that I would be involve in , so . . .
Q.     And why is that?
A.     A store manager change is typically what we call a two-up decision, and that would be the district manager and the regional manager.

sales, to which Tibbetts responded by saying "that my priority was not in cell phones." (Tibbetts Dep., at 48.) Tibbetts also acknowledged that he knew that selling cell phones is a RadioShack corporate policy. (*Id.*) After this meeting, Lohse decided that Tibbetts should be terminated based upon Tibbetts's performance, attitude, and work quality. (Def.'s 56.1 ¶ 39.) Plaintiff emphasizes that under RadioShack's "two up" policy, Lohse could not make the decision without the approval of Regional Sales Manager James Bradley (Pl.'s Response ¶ 84), but as described earlier, Bradley testified that Lohse made the decision that Tibbetts should be terminated, and that Bradley allowed him to do so. (Def.'s 6.1 ¶ 40, citing Bradley Dep., Ex. 9 to Def.'s 56.1, at 159, 192.)

Without any more formal advance notice, (Pl.'s 56.1 ¶ 25), on November 14, 2002, Lohse terminated Tibbetts. (*Id.* ¶ 23, Def.'s 56.1 ¶ 41.) In a Manager Turnover Information Sheet dated November 14, 2002, Lohse explained:

> Dave Tibbetts has been told on several occasion that if his attitude did not get significantly better, store appearance 301 or better, and better training and recruiting effort she (sic) would not be manager the new location and that I would not have a management position at any other locations.

(Manager Turnover Information Sheet, Ex. 25 to Pl.'s 56.1.) A Personal Change Request dated November 15, 2002 identifies "unsatisfactory performance" as the reason for the change, and rates the quality of Tibbetts's work and his attitude as "unsatisfactory." (Personal Change Request, Ex. 23 to Pl.'s 56.1.) In addition, RadioShack asserts that it received customer complaints concerning Tibbetts, including some in the months prior to his termination. (Def.'s 56.1 ¶ 20.)[11] After Tibbetts's termination, RadioShack promoted Otoniel Ortiz to sales manager and assigned him to manage store 016498 at the new store location. (Pl.'s 56.1 ¶ 27; Def.'s 56.1 ¶ 41.)

RadioShack records reflect that, during the three years before Tibbetts's discharge, no other store managers were terminated due to customer complaints, store appearance, people

---

[11]    Plaintiff denies this, but the paragraph of his own affidavit on which he relies states only that Tibbetts did not receive *notice* of such complaints in the months prior to his termination.

readiness or sales readiness grades. (Pl.'s 56.1 ¶ 56.) James Bradley recalled one sales manager

who had been terminated for poor store appearance, and Lohse recalled that a Gary, Indiana store

manager was terminated for that reason in 2001 or 2002; Robert Martinjak could not recall the

names of any managers terminated for reasons of sales, store appearance, or sales readiness.

(Def.'s Response ¶¶ 57-59.) Plaintiff presents evidence of the poor performance of several other

RadioShack store managers in the period from September 2001 to September 2002 who were

nevertheless not discharged, (Pl.'s 56.1 ¶¶ 86-92), but none of those managers was assigned to

a store expected to move to a new location. (Def.'s Response ¶¶ 86-92.)[12] No other RadioShack

store in district 0568 moved during Lohse's tenure as district manager. (Def.'s 56.1 ¶ 49.)

**Perez Action**

On October 31, 2002, David Tibbetts was one of four named plaintiffs in a complaint filed

in this court on behalf of a class of RadioShack store managers under the Fair Labor Standards

Act. (Pl.'s 56.1 ¶ 5.) RadioShack's corporate agent, CT Corporation System, was first served with

that lawsuit on Friday, November 1, 2002. (Def.'s 56.1 ¶ 78; Pl.'s 56.1 ¶ 7.) The corporate agent

forwarded the complaint to RadioShack's general counsel, where it was received on November 4,

2002. (Pl.'s ¶ 8; Def.'s 56.1 ¶¶ 78-80.) Tibbetts did not discuss the Perez lawsuit with any of his

superiors prior to his termination, nor did Tibbetts ever hear Lohse discuss that suit. (Def. 56.1

¶¶ 42, 43.) Lohse testified that he was unaware of the case prior to Tibbetts's termination (Def.'s

56.1 ¶ 44, citing Lohse Dep., Ex. 10 to Def.'s 56.1, at 54, 170, 178), and Tibbetts has no evidence

to the contrary; he simply asserts that the court should infer such knowledge from the fact that Mr.

Martinjak, who, Plaintiff asserts, did know of the case, met with Lohse on November 12 and 13.

(Pl.'s Response ¶ 88.) James Bradley was also unaware of the Perez case or Mr. Tibbetts's

---

[12]     Plaintiff also presents evidence that store managers in other districts performed
poorly but were not discharged, but as these individuals reported to District Managers other than
Mike Lohse, the court sustains Defendant's relevance objections to this evidence. (Pl.'s 56.1
¶¶ 99-103.)

overtime claim on the date of Tibbetts's termination and did not discuss those matters with Lohse prior to November 15. (Def.'s 56.1 ¶¶ 45, 46.)  On November 8, 2002, Mr. Martinjak received an e-mail message which, Plaintiff contends, described the *Perez* lawsuit (Pl.'s 56.1 ¶ 11), but there is no evidence that he saw a copy of the complaint identifying Tibbetts as a named plaintiff at that time.  Martinjak's own memory of when he learned of the lawsuit was vague; he recalled learning of it in December 2002 because of "all . . . the press" and speculated that he might have seen it in *USA Today* (which, according to Plaintiff, has never covered the case) only because that is the paper that Martinjak reads when "on the road."  (Pl.'s 56.1 ¶ 125; Martinjak Dep. Ex. 11 to Pl.'s 56.1, at 57.)  Martinjak has sworn that he was not aware of Tibbetts's participation in the lawsuit during his November 2002 visit and did not discuss it with Mr. Lohse.  (Pl.'s Response ¶ 91; Def.'s 56.1 ¶¶ 47, 48, citing Martinjak Declaration, Ex. 5 to Def.'s 56.1 ¶¶ 24, 25; Lohse Dep., at 175.)

**Tibbetts's Purported Promotion in October 2002**

It is undisputed that Plaintiff had the title of store manager at the time of his termination. (Pl.'s 56.1 ¶ 24.)   He nevertheless contends that RadioShack records reflect his promotion to senior manager status in October 2002, (*id.* ¶ 33), and the parties have devoted significant attention to this issue in their factual submissions.  In 2002, RadioShack store managers with more than five years' tenure were considered for promotion to the Senior Manager program.  (Def.'s 56.1 ¶ 50.) Under RadioShack's regulations, to be eligible for promotion, a store manager (1) must have at least five years of service as a store manager; (2) must "contribute a minimum of 7% of earnings" to corporate stock programs through payroll deduction; (3) must have a "sales gain" for the current fiscal year; and (4) must "have maintained a People grade of C or above and a Perception grade of 301 or above." (Def.'s 56.1 ¶ 51, citing RadioShack Supplemental Benefit Plan for Senior Managers, revised effective 1/2002, Ex. 28 to Def.'s 56.1.)  Plaintiff denies that these criteria were enforced, but cites only the facts (a) that he himself did not meet the people grade or

perception grade requirements from 1995 through 2002 and was not demoted; and (b) that according to District Sales Manager William Morrow, "other sales managers in District 0565 retained senior manager status despite People Grades below a 'C' and Perception Grades below '301'." (Pl.'s Response ¶ 95, citing Tibbetts Aff., Ex. 1 to Pl.'s Response, ¶ 28; Morrow Aff., Ex. 2 to Pl.'s Response, ¶ 13.)  As Defendant's criteria address eligibility for *promotion* to Senior Manager rather than *retention* of such a position, however, the court deems Def.'s 56.1 ¶ 51 admitted. (*See* Def.'s Response ¶ 40.)  Morrow attested that the only mandatory requirements for admission to the senior manager program were five years' tenure and participation in the RadioShack stock program, but he did not state that he had promoted persons who lacked the remaining requirements. (Morrow Aff. ¶ 11.)

In October 2002, Yolanda Ricks-Tinzy of RadioShack's Accounting Department received from the Payroll Department a list of managers who met the five-year-tenure requirement for promotion to Senior Manager.   (Ricks-Tinzy Deposition, Ex. 13 to Def.'s 56.1, at 17.)   On October 8, 2002, Ms. Ricks-Tinzy sent an e-mail message to Regional Manager James Bradley in which she identified candidates who were eligible under the seniority and stock contribution requirements for the Senior Manager Program. (*Id.* at 19-21; Ricks-Tinzy e-mail message to Bradley, Ex. 29 to Def.'s 56.1.)  David Tibbetts was among those listed within the "first group of managers," who, according to Ms. Ricks-Tinzy's message, would "be added to the ranks of Senior Manager unless we receive a response from the [Regional Sales Manager] by October 15 clearly outlining the specific reason (based on criteria) and information regarding the communications your [District Sales Manager] has had with the manager to support the decision." (*Id.*)  Ms. Ricks-Tinzy's message directed Mr. Bradley to let her know by October 15 "if you wish to advise accounting that a manager should not be placed in the Senior Manager program. . . ." (*Id.*)

13

Mr. Bradley responded to Ms. Ricks-Tinzy's e-mail by placing a letter "n" behind the name of each of the managers in her "first group" list, including Tibbetts's name. (*Id.*)[13] Although Mr. Bradley's response did not "outlin[e] the specific reason (based on criteria)" for his decision, Ms. Ricks-Tinzy testified that she understood the "n" meant "no": "[A]nybody who has an "n," we go in and we pull those PCRs [Personnel Change Records] so they will not be in as a senior manager." (Ricks-Tinzy Dep., at 23.)   Ms. Ricks-Tinzy explained that the RadioShack payroll department generated a Personnel Change Record ("PCR") for each manager eligible by reason of tenure for participation in the Senior Manager program; when she received a stack of PCR forms from payroll on October 16, 2002, Ms. Ricks-Tinzy pulled out the form for any person whom the Regional Manager had advised her would not be promoted. (Def.'s 56.1 ¶¶ 58-60; Ricks-Tinzy Dep., at 16-30.)[14]   She then returned the remaining PCRs to the payroll department for processing. (Ricks-Tinzy Dep., at 23, 27.)

Cathy Simpson, RadioShack's Payroll Assistant Controller, confirmed that a review of the payroll records show that no PCR for promotion of Mr. Tibbetts was entered into the RadioShack payroll. (Simpson Dep., Ex. 15 to Def.'s 56.1, at 36; Simpson Declaration, Ex. 7 to Def.'s 56.1, ¶ 6.) The parties agree that a promotion from sales manager to senior sales manager would not have resulted in a pay increase (Pl.'s 56.1 ¶ 37), but Defendant points out that such a promotion would be noted in payroll and personnel records. Yet RadioShack's payroll and personnel records all reflect Tibbetts's job code as "MB" rather than as "LB," which, Simpson explained, reflects Tibbetts's status as a store manager, not a Senior Store Manager. (Simpson Decl. ¶ 4.)

---

[13]   Plaintiff asserts that Bradley does not remember "giving his disapproval," (Pl.'s 56.1 ¶ 53), but Bradley's memory lapse does not render the written record unreliable.

[14]   Plaintiff denies this narrative and asserts that Defendant "fails to identify a time period and fails to identify the 'list of managers' referenced." (Pl.'s Response ¶ 102.) From reading her deposition, the court has little difficulty concluding that Ms. Ricks-Tinzy was describing the promotion process in a general way but outlining in particular the process that took place in October 2002.

According to RadioShack, Tibbetts was not eligible for promotion to the Senior Manager program in October 2002 because his demotion from that position had occurred just two months earlier. (Def.'s 56.1 ¶ 67; Simpson Decl. ¶¶ 8-10.)  Tibbetts acknowledges that RadioShack policy provides that "A manager who is removed from the Senior Manager Program but remains a store manager will be eligible for readmission after one year." (Pl.'s Response ¶ 111.)[15]  Tibbetts also did not have a sales gain for fiscal year 2002, as required by RadioShack policy for promotion to Senior Sales Manager. (Def.'s 56.1 ¶ 70.)[16]  He acknowledges, further, that during the six months prior to October 2002, he failed to score an average people readiness grade of "C" or above, but points out that RadioShack was apparently willing to tolerate this poor performance from January 1997 until July 8, 2002, when he enjoyed the Senior Store Manager title despite his failure to maintain even a "C" average people readiness grade during that long period. (Pl.'s Response ¶ 112.)  Similarly, Tibbetts admits he failed to score an average sales readiness grade of 301 or above during the six months prior to October 2002, but points out that his grades were just as low from January 1997 through July 2002. (Pl.'s Response ¶ 113; Pl.'s 56.1 ¶ 41.)  Tibbetts asserts that certain other store managers were promoted to Senior Sales Manager without the required

---

[15]     Plaintiff contends this rule was not enforced, but the court is at a loss to understand how the materials he cites support that assertion: The store visit reports he cites do no more than reflect Tibbetts's own chronic performance deficiencies. (Store Visit Reports, Ex. 21 to Pl.'s Response.)  The store visit tracking log shows that over a 12-month period, under Tibbetts's watch, Store 016498 had an abysmal average mark of 1.8 for sales readiness and an average grade of D+ (the lowest of all stores listed) for people readiness. (District Store Visit Tracking Log, Ex. 30 to Pl.'s Response.)  Morrow's affidavit states that Tibbetts retained his status as a Senior Store Manager despite his low people readiness and perception marks (Morrow Aff., Ex. 2 to Pl.'s Response, ¶ 13), but Morrow's role as Tibbetts's District Manager ended in July 2002.  In any event, neither Morrow's affidavit, nor Tibbetts's own assertion that five-year tenure and stock program participation were the only requirements for promotion, create a dispute of fact concerning Defendant's assertion that, after demotion, Tibbetts was ineligible for the Senior Store Manager program for a one-year period.

[16]     Plaintiff points out that as of October 31, 2002, District 0568 (in which his store was located) had suffered a year-to-date loss of $247,102.00, a percentage loss of 1.73%.  The fact that the entire district had difficulties is, of course, not at all inconsistent with Defendant's assertions about Plaintiff's own performance, which is deemed admitted.

average grades, but he has not cited evidence concerning the scores and grades of the managers involved.  (Def.'s Response ¶ 42.)

Tibbetts notes that a copy of a PCR reflecting his promotion to Senior Sales Manager appeared in the copy of his personnel file produced in discovery.  (Pl.'s 56.1 ¶ 34; Stephan Affidavit ¶¶ 1-6, Ex. 3 to Pl.'s 56.1.)  Ms. Ricks-Tinzy's testimony adequately explains the origins of that document, and the court concludes that, in light of all of the circumstances described here, its apparently mistaken inclusion in Tibbetts's file does not establish that the promotion actually took place.

At the time he was hired by RadioShack, Tibbetts acknowledged that his employment was "at will."  (Def.'s 56.1 ¶ 71.)  In July 2001, he again acknowledged the at-will nature of his employment by signing a written form that so stated.  (*Id.* ¶ 71.)  At that time, Tibbetts had the title of Senior Store Manager.  He admits that the Senior Manager Supplement material he received also characterizes his employment relationship as "at will."  (*Id.* ¶¶ 73-75.)  Tibbetts points out that RadioShack policy provides that a Senior Store Manager may not be demoted or terminated unless he has received two written notices of unsatisfactory job performance within a 120 day period; no such notices were issued to him. (Pl.'s 56.1 ¶¶ 38, 39.)

## DISCUSSION

In his two-count complaint, Plaintiff alleges that his November 14, 2002 termination constituted retaliation for his participation in the *Perez* lawsuit (Count I) and breached his rights under an employment agreement (Count II).  For the reasons explained here, the court concludes that Defendant is entitled to summary judgment on each of these two claims.

### I.    Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

16

to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R.

CIV. P. 56(c).  In determining whether there is a genuine issue of fact, the court must view the

evidence and draw all reasonable inferences in favor of the party opposing the motion.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bennington v. Caterpillar Inc.,* 275 F.3d

654, 658 (7th Cir. 2001).  The court's function in ruling on a motion for summary judgment is not

to weigh the evidence, but rather to determine if there is a genuine issue for trial.  *Anderson,* 477

U.S. at 249.  Where factual matters are in dispute, the court is required to credit the nonmovant's

version of events.  *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000).

In determining whether there is a genuine issue for trial, the court is "entitled to limit its

analysis of the facts on summary judgment to evidence that is properly identified and supported

in the parties' [Local Rule 56.1] statements." *Bordelon v. Chicago Sch. Reform Bd. of Trustees,*

233 F.3d 524, 529 (7th Cir. 2000).  Where a proposed statement of fact is supported by the record

evidence and not adequately rebutted, the court is entitled to presume that statement is true for

purposes of summary judgment.  Where the denial of a proposed statement is not supported by

the material cited, the moving party's assertion may be deemed admitted, regardless of what

contrary evidence is in the record. *Id. See also Rogers v. City of Chicago,* 320 F.3d 748, 751 (7th

Cir. 2003); *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001).

## II.      FLSA Retaliation Claim

The Fair Labor Standards Act prohibits retaliation against an employee for exercising his

rights under the Act.  29 U.S.C. § 215(a)(3); *Scott v. Sunrise Healthcare Corp.,* 195 F.3d 938, 940

(7th Cir. 1999).  Specifically, the statute provides that "it shall be unlawful for any person . . . to

discharge or in any other manner discriminate against any employee because such employee has

filed any complaint or instituted or caused to be instituted any proceeding under or related to this

chapter . . . ." 29 U.S.C. § 215(a)(3).  Plaintiff contends the circumstantial evidence demonstrates

17

that Defendant RadioShack terminated him in November 2002 in retaliation for his participation, as a named plaintiff, in the nationwide opt-in class action that was filed against RadioShack by store managers in October 2002.

The parties agree that under Seventh Circuit precedent, a plaintiff claiming retaliation can avoid summary judgment by presenting evidence that supports his claim either directly or indirectly. *See Cichon v. Exelon Generation Co.*, No. 02 C 3441, 2003 WL 22169761, *1 (N.D. Ill. Sept. 18, 2003) (Kocoras, J.) (in absence of any explicit formulation for analyzing FLSA retaliation claims, court adopts the formulation for retaliatory actions under Title VII). Under the direct method, the plaintiff presents evidence of statutorily-protected activity, an adverse employment action, and a causal connection between the two. *Lang v. Illinois Dep't of Children and Family Servs.*, 361 F.3d 416, 418-19 (7th Cir. 2004) (citing *Sitar v. Indiana Dep't of Transp.*, 344 F.3d 720, 728 (7th Cir. 2002); *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Under the familiar indirect method of proof, the employee offers evidence that he engaged in protected activity, performed his job to his employer's legitimate expectations, suffered adverse action, and was treated less favorably than similarly-situated workers who did not engage in such activity. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 465 (7th Cir. 2002); *Stone*, 281 F.3d at 644.

As the parties in this case recognize, both methods of proof assume that the decision-maker is aware of plaintiff's statutorily-protected activity. Yet on this critical matter, the court finds that the evidence does not create a genuine issue of fact. The parties have amassed a large record, which the court has reviewed in detail. Ultimately, however, this is an uncomplicated case. Simply put, there is no credible evidence that Mike Lohse knew anything about the *Perez* case on or before November 14. The case was not filed until October 31, and Tibbetts himself never discussed it with Lohse. Neither Lohse nor the Regional Sales Manager, James Bradley, had any information concerning the *Perez* case.

18

Tibbetts points the finger at Robert Martinjak, RadioShack's Vice President for the Midwest Division. He notes that Martinjak received an e-mail message from RadioShack's general counsel on November 8, 2002, just days before Tibbetts's discharge. Plaintiff is certain that this e-mail described the *Perez* action. Martinjak himself testified that he does not recall learning about the *Perez* case until some time in December, but for purposes of summary judgment, the court will presume that the November 8 e-mail made some reference to the case. There is no basis, however, for Plaintiff's conclusion that Martinjak knew that Tibbetts himself was a named plaintiff in that case as of November 8. Nor is there any basis from which the court can draw an inference that Martinjak communicated this information to Lohse: both men have denied it, and there is no written record or other evidence to the contrary. Finally, there is no evidence that Martinjak played a decisive role in Tibbetts's discharge. Again, he denies playing such a role, and his involvement would in any event be inconsistent with the "two-up" policy which Plaintiff himself so emphasizes.

Even if the court were to accept Plaintiff's invitation that it connect all of these (invisible) dots in some fashion, his retaliation claim would still not survive summary judgment because there is ample support for Defendant's contention that the decision to remove Tibbetts as manager of the Evanston store was made well prior to the date of filing of the *Perez* lawsuit. Plaintiff urges that there are disputes of fact concerning this issue, as well, but Lohse testified that he had made that decision in October, and Bradley confirmed that the decision to remove Tibbetts as manager had been made "two to three weeks" before November 15. Lohse assigned Otoniel Ortiz to the new Evanston store in October, before the *Perez* case had been filed. No evidence supports Plaintiff's suspicion that Ortiz had not completed manager training by that time, and even if he had not, there would be no room for doubt that Lohse preferred Ortiz to Tibbetts as manager of the Evanston store already in October, before the filing of the *Perez* lawsuit. In *Clark County School District v. Breeden*, 532 U.S. 268 (2001), plaintiff claimed her employer transferred her in retaliation for her filing of a Title VII case. Noting that the employer had been contemplating the transfer even before

19

the suit was filed, the Supreme Court observed, "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." 532 U.S. at 272.  Here similarly, Lohse's decision to replace Tibbetts as manager in Evanston had been made prior to the filing of the *Perez* lawsuit.  Even if Lohse had learned of the lawsuit in November, his proceeding with this decision would not constitute retaliation.

The court concludes there is no basis for an inference of retaliatory motivation.  Though it need not reach the matter, the court notes that any such inference is in any event defeated here by the substantial evidence of RadioShack's legitimate, nondiscriminatory reason for removing Tibbetts.  There is a substantial written record of Tibbetts's inadequate performance as manager of the Evanston store, and RadioShack argues that Tibbetts is unable to establish that its criticisms of his performance are a pretext for retaliation.  Tibbetts actually concedes that his store readiness and people readiness marks were among the lowest of any store manager in his district.  In Tibbetts's analysis, his record of deficient performance actually bolsters his case: he reasons that RadioShack's willingness to tolerate his conduct for years demonstrates that his performance could not be the real reason for his discharge.  Tibbetts also suggests that at least some of his District Managers' criticisms may have been overstated, a product of what he believes is RadioShack's official policy of finding fault with its stores.

RadioShack was indeed tolerant of Tibbetts's inadequacies for many years.  Perhaps due to the relatively frequent turnover of District Managers, their frequent threats and warnings were not carried out.  Further, at least a handful of other store managers in the district had records as bad, or nearly as bad, as Tibbetts's, but were retained.  RadioShack has not effectively explained its acceptance of mediocrity, or worse, on the part of its store managers.  That said, the court agrees with Defendant that Tibbetts has not shown that any similarly-situated store managers were treated more favorably than he was.  Tibbetts was the only manager in his district whose store was

20

being moved to a new location.  RadioShack contends that in light of Tibbetts's difficulties and attitude, the company was unwilling to assign him to manage its brand new store.  For the reasons stated above, the court need not reach this issue, but notes that Tibbetts has not rebutted RadioShack's assertion that the new store made a difference.

Defendant is entitled to summary judgment on Tibbetts's FLSA retaliation claim.

## C.    Wrongful Termination Claim

Tibbetts's wrongful termination claim bears only brief discussion.  Tibbetts himself devotes only two pages of his response brief to this claim.  Tibbetts has acknowledged that he was an "at will" employee of RadioShack.  The only basis for his argument that he had a right to certain procedural safeguards before being terminated is his theory that he was readmitted to the Senior Manager Program in October 2002.

The facts concerning that theory are largely uncontested.  Tibbetts was "eligible" for admission to that program only by virtue of his years of experience and his participation in an investment program.  He acknowledges that he was ineligible in all other respects. His managerial performance ratings fell below the minimum required for promotion.  He had not posted the required "sales gain."  He had been demoted from that position for poor performance just four months earlier, and RadioShack policy rendered him ineligible for at least one year after such a demotion.  In response to Ms. Ricks-Tinzy's administrative request, Regional Sales Manager James Bradley marked Tibbetts's name with the letter "n" for "no," i.e., not eligible for promotion. Although she had prepared a Personnel Change Record for Tibbetts and for all other managers who had five years' experience and the necessary investment record, Ms. Ricks-Tinzy pulled that form out.  It is undisputed that the form was never processed by RadioShack's payroll department, and that the payroll records at the time of his discharge reflected Tibbetts's status as a store manager only.

Against this, Tibbetts offers only the fact that the Personnel Change Record that Ms. Ricks-Tinzy generated somehow found its way into Tibbetts's file, and that RadioShack took no action to correct that record mistake. This court concludes this reed is far too thin to establish that Tibbetts was entitled to the procedural safeguards available to a Senior Sales Manager. In support of his claim that he was entitled to written notices of his unsatisfactory job performance before he could be discharged, Tibbetts cites just one case: *Duldulao v. St. Mary of Nazareth Hosp Ctr.*, 115 Ill.2d 482, 505 N.E.2d 314 (1987). *Duldalao* recognized the presumption in favor of "at will" employment, and observed that the presumption can be overcome where the traditional requirements for contract formation are established. Specifically, an employee handbook or other policy statement can create contractual rights if it contains a promise clear enough to constitute an offer; was disseminated in such a way that the employee reasonably believes it is an offer; and the employee accepts it by commencing or continuing to work after learning of it. *Id.* at 490, 505 N.E.2d at 318.

Tibbetts does not bother to discuss any of these elements. Moreover, the very first paragraph of the Senior Manager Supplement, on which Tibbetts apparently relies, expressly disclaims the creation of any contractual relationship between the Senior Sales Manager and RadioShack:

> The Senior Manager Program is not an employment contract, and it is understood that the employment relationship with RadioShack is an at-will relationship. The Company reserves the right to modify, amend, or terminate the Senior Manager Program at any time, with or without notice.

(Supplemental Benefit Plan for Senior Managers, Ex. 41 to Pl.'s 56.1.) Under Illinois law, such a disclaimer "can be sufficient to show that no 'clear promise' of continuing employment was made, and thus that the handbook did not create a legitimate claim of entitlement to employment." *Border v. City of Crystal Lake*, 75 F.3d 270, 273 (7th Cir. 1996).

22

There is no dispute of material fact on the issue of Plaintiff's status at the time of his discharge: He was a store manager, not a Senior Sales Manager, and RadioShack's apparent record-keeping error does not change that.  Even if Plaintiff could create a dispute of fact on this issue, the court concludes that he is not entitled to any contractual protections as a matter of law. RadioShack is entitled to summary judgment on his wrongful termination claim.

**<u>CONCLUSION</u>**

RadioShack's motion for summary judgment (Doc. No. 30-1) is granted.

ENTER:

Dated: September 30, 2004

REBECCA R. PALLMEYER
United States District Judge